**UNTIED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

SCOTT TRUJILLO,

       Plaintiff,

v.

HENNIGES AUTOMOTIVE SEALING
SYSTEMS NORTH AMERICA, INC. a
Foreign Corporation d/b/a "GDX
Automotive" and formerly known as "GDX
North America, Inc.",

       Defendant.

_____/

CASE NO. 09-13751

HON. MARIANNE O. BATTANI

**OPINION AND ORDER GRANTING DEFENDANT'S
SECOND MOTION FOR SUMMARY JUDGMENT**

This matter is before the Court on Defendant Henniges Automotive Sealing Systems North America, Inc.'s ("Henniges") Second Motion for Summary Judgment. (Def.'s Mot. Summ. J., ECF No. 44). Plaintiff Scott Trujillo filed this lawsuit asserting Henniges discharged him for opposing discrimination in violation of Title VII of the Civil Rights Act of 1964 and the Michigan Elliott-Larsen Civil Rights Act. For the reasons stated below, Defendant's motion is **GRANTED**.

**I.    STATEMENT OF FACTS**

    **A.    Background**

In April 2008, Henniges hired Scott Trujillo, a male of Mexican national origin, as Corporate Controller, responsible for management of the company's financial reporting and tax requirements. He reported directly to Henniges' Chief Financial Officer Larry

Williams. Trujillo joined the company shortly after it formed; the result of a large-scale merger of former competing companies, Metzeler and GDX.

### A. Trujillo's Performance Issues

Henniges' executive management team consisted of CEO Rob DePierre, CFO Larry Williams, and all executive vice presidents. The executive management team required Trujillo to prepare weekly "flash reports" comparing sales forecasts and budgets for twelve Henniges plants. The reports were due on Wednesday of each week. Henniges contends Trujillo made numerous errors and failed to provide timely reports to management. A series of emails evidences the failures wherein Trujillo apologizes for late or erroneous reports, and subsequently sends out revised reports. In an email dated May 8, 2008, Trujillo states, "Very sorry for the oversight" and attaches a revised flash report. On June 12, 2008, Trujillo sent another late and incomplete flash report. Based on the late reports, DePierre met with Williams and Trujillo to stress the importance and timeliness of the flash reports. Trujillo indicated he understood DePierre's concerns.

On July 9, 2008, Trujillo sent out another incomplete flash report. The next week, he again sent out an erroneous flash report and sent out a revised report the next day. Trujillo admitted fault and stated, "Some of my numbers were incorrect there as well. Must have had a bad night." The same error occurred the next week, wherein Trujillo sent out another erroneous and incomplete report. As a result, DePierre sent Trujillo an email expressing his frustration:

> Your explanation does not help. Do we or don't we have the ability to take a gain at Grefath and will we take income at the Czech? After three weeks I expect an answer. Please answer the question with an

2

explanation. I'll look for the total answer tomorrow. Let me know if you can not get the answer and I will get it myself.

(Def.'s Mot. Summ. J. Ex. 6, ECF No. 44). Trujillo again submitted an inaccurate report on August 20, 2008. This time, Williams noticed the mistake and Trujillo apologized for his oversight: "I just wanted to acknowledge that I should be able to get this thing right the first time. No excuses [sic] for the silly mistakes. It's like missing a lay-up (or an open net break-away since I know you're a hockey man)." (Id. at Ex. 9). Nonetheless, Trujillo submitted his report late the next week.

In addition, Trujillo submitted monthly reports involving the plants' financial results. Williams and DePierre testified they were dissatisfied with Trujillo's reports because they were often incomplete and vague. Both Williams and DePierre were concerned with the timeliness of Trujillo's other work, as he was often behind schedule. Trujillo admits and apologizes for this in an email dated July 18, 2008. Williams also asserts that he was dissatisfied with Trujillo's presentation at a Controllers Conference in July 2008.

### B. Europe Team

In late August 2008, Henniges assigned Trujillo to a team responsible for creating plans to assist struggling plants in the Czech Republic and Germany. Trujillo's role focused on the financial perspective of the plants. In September, Trujillo traveled to Europe to gather data and prepare a financial package. He also accompanied the executive team on a return trip to assist them with the numbers.

At some point during the trip in the Czech Republic, Trujillo and Larry Rollins engaged in discussion surrounding Wayne Campbell's treatment of Juan Perez, Controller of Henniges' Guadalajara plant. Regarding the discussion, Trujillo testified

that it took place on the first or second day in the Czech Republic during "some downtime working on the task force" in a "room." (Trujillo Dep. 234:10-235:23, June 16, 2010). Trujillo posited that Campbell's aggressive managerial style may not appeal to Perez. (Id. at 235:1-15). In response, Rollins stated "Fuck that cultural bullshit, Scott, and tell Juan to grow up." (Id. at 235:16-19).

In another meeting during the trip, Trujillo asserts "Rollins mentioned that he would be missing his son's football game but was not that upset since the team would be losing to a team of 'brothas.'" (Pl.'s Resp. 4, ECF No. 46); (Trujillo Dep. 237:8-19). Trujillo testified that this occurred either on the same day or the next day after the discussion about Perez and Campbell. (Trujillo Dep. 237:8-19). He corrected Rollins by using the term "African-Americans." Trujillo stated that Lihosit and VanZoest were present during this meeting. (Id. at 244:13-24).

On yet another night, Trujillo attended a dinner with senior management. VanZoest, Rollins, Geri Gasperut, Rob Lihosit, and Howard Boyer were present. Gasperut served as Vice President of Human Resources. At some point, the conversation focused again on Juan Perez. Rollins stated that Perez was "fucking worthless." (Rollins Dep. 88:5-6, Aug. 18, 2010). At the end of dinner, Trujillo approached Gasperut and complained about "Rollins' continued . . . choice to say inappropriate or derogatory things about other races." (Trujillo Dep. 240:4-9). Trujillo further explained, "I kind of was just venting. I was not intending for her to take action . . . . (Id. at 240:20-21). When asked about which comments he mentioned to Gasperut, Trujillo stated, "I don't recall being specific about the comments, the brothers comment and the wetback comment. I'm certain I didn't mention those to her. I can only tell you

4

that I brought them up in general terms . . . ." (Id. at 241:23-242:3). Trujillo also stated that he believed Gasperut reasonably interpreted his complaint to refer only to Rollins' comments at dinner "beating up on the Mexican controllers" as "fucking worthless." (Id. at 243:3-244:4). The next morning, Gasperut told the members to "watch what [they] say" because it may affect others. (Gasperut Dep. 116:1-12). She mentioned that she "made it sound like I was the one who picked up that they were maybe a little insensitive the night before and that they needed to watch that in the future." (Id. at 119:23-120:2). Gasperut also noted that Trujillo's complaint was "vague" and she did not want to make a "big deal out of it" because "Scott didn't ask me to make a big deal out of it." (Id. at 113:23, 115:3-15). She also stated that Trujillo did not give her any particulars and "[Trujillo] just said that it was uncomfortable, or it was beginning to be uncomfortable, or something like." (Id. at 117:12-14).

Trujillo returned from the trip on September 8. That same week, Williams and Gasperut spoke about Williams' concerns regarding Trujillo's work performance. (Id. at 39:8-24). Williams mentioned that it was time to terminate Trujillo because of the quality of his work in Europe and the similar frustration of DePierre with Trujillo's work. (Williams Dep. 61:20-63:1, June 16, 2010).

### C. Trujillo is Terminated

On September 15, 2008, Williams called Trujillo to his office to terminate him. Williams stated that he felt Trujillo was not a "good fit," but did not provide other reasons. Gasperut, who was present during the meeting, spoke with Trujillo after the meeting. She told him that executive members were frustrated with his work and that DePierre was a tough supervisor to please. (Def.'s Mot. Summ. J. 19-20, ECF No. 44).

### D. Procedural History

Trujillo filed the instant action on September 22, 2009 for retaliatory discharge for opposing discrimination in violation of Title VII of the Civil Rights Act of 1964 and the Michigan Elliott-Larsen Civil Rights Act, alleging four instances of protected activity. Henniges filed a Motion for Summary Judgment on September 20, 2010. On January 11, 2011, the Court granted summary judgment in favor of Henniges because Trujillo "did not oppose any Title VII violations" in those four incidents. Although, the Sixth Circuit affirmed the Court's decision regarding three incidents, it reversed on Trujillo's complaint to Gasperut regarding Rollins' comments during dinner in Europe. Henniges subsequently filed the instant motion.

## II. STANDARD OF REVIEW

Summary judgment is appropriate only when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986). Rule 56 mandates summary judgment against a party who fails to establish the existence of an element essential to the party's case and on which that party bears the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. Once the moving party meets this burden, the non-movant must come forward with specific facts supported by affidavits or other appropriate evidence establishing a genuine issue for trial. Matsushita Elec.

Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Fed. R. Civ. P. 56(c)(1)(A). In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). The Court "must lend credence" to the non-moving party's interpretation of the disputed facts. Marvin v. City of Taylor, 509 F.3d 234, 238 (6th Cir. 2007) (citing Scott v. Harris, 127 S.Ct. 1769, 1775 (2007)). The mere existence of a scintilla of evidence in support of the non-moving party's position will not suffice. Rather, there must be evidence on which the jury could reasonably find for the non-moving party. Hopson v.DaimlerChrysler Corp., 306 F.3d 427, 432 (6th Cir. 2002).

### III. ANALYSIS

To establish a prima facie case of retaliation with circumstantial evidence under Title VII, a plaintiff must establish that (1) he engaged in protected activity; (2) this exercise of protected rights was known to the defendant; (3) the defendant thereafter took an adverse employment action against the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action. Thompson v. North Am. Stainless, LP, 567 F.3d 804, 809 (6th Cir 2009) (en banc) (quotations omitted). Regarding the "protected activity" element, the United States Supreme Court explained:

> The Title VII antiretaliation provision has two clauses, making it "an unlawful employment practice for an employer to discriminate against any of his employees . . . [1] because he has opposed any practice made an unlawful employment practice by this subchapter, or [2] because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). The one is known as the "opposition clause," the other as the "participation clause . . . ."

7

Crawford v. Metro Gov't. of Nashville & Davidson Cnty, Tenn., 555 U.S. 271, 274 (2009). Accordingly, "protected activity" in an opposition clause case requires a plaintiff to establish that he "opposed" unlawful employment practices. The Sixth Circuit concluded Trujillo engaged in protected activity when he reported his concerns to Gasperut regarding Rollins' "continued . . . choice to say inappropriate or derogatory things about other races." (Sixth Circuit Op. 6-7, ECF No. 38). Thus, the Court will only address the remaining elements required to establish a prima facie case.

### A. Knowledge of Protected Activity

In order to demonstrate a prima facie case of retaliation, Trujillo's protected activity had to be "known to those who made [the adverse employment] decision." Cline v. BWXT Y-12, LLC, 521 F.3d 507, 513 (6th Cir.2008). Trujillo asserts Gasperut knew of the protected activity, and in turn, provided this information to Williams and other members of the executive management team responsible for Trujillo's termination. However, a thorough review of the record indicates Gasperut did not understand Trujillo's complaint to refer to discriminatory comments made by Rollins. Viewing the facts in a light most favorable to Trujillo, he fails to demonstrate a prima facie case.

In order for Trujillo's theory to succeed, Gasperut must have known Trujillo's complaint involved Rollins' previous discriminatory comments as opposed to Rollins' harsh criticism of Perez's performance during the dinner. The former strengthens the claim of knowledge of protected activity; the latter undermines it. Gasperut testified that she did not understand Trujillo's comments to refer to discrimination and that his complaint was "vague." (Gasperut Dep. 113:23). In fact, he only indicated that he was "uncomfortable" with Rollins. (Id. at 117:12-14). Trujillo never previously complained of

any such comments to anyone at Henniges, including Gasperut or Larry Williams. (Id. at 114:1-3; Trujillo Dep. 246:7-9). Moreover, Trujillo testified that he did not explicitly tell Gasperut which of Rollins' comments bothered him, and that he believed Gasperut misunderstood the nature of his complaint as referring to Rollins' harsh criticism of Perez's competence, not Rollins' previous discriminatory comments. (Trujillo Dep. 241-244). Trujillo's deposition testimony belies his assertion that he mentioned "race" in his complaint to Gasperut:

> Q: I believe you were here for this testimony as well. I believe [Gasperut] testified that she understood your concerns to relate more to sort of the unprofessionalism of the comments, you know, questioning the professionalism of the controllers and the abilities of the controllers who happened to be Mexican, *not necessarily that you were concerned that they were making racist comments*.
>
> A: Right.
>
> Q: Is that correct?
>
> A: I understood the testimony the same way. That was not my intention. I would say that it was clear from the testimony – and again, that testimony was the first time I learned that she had actually talked about my concerns with them, but it was *clear during that testimony that she gave that I think she misunderstood what I was referring to.*
> I think she made an assumption about some conversation the night prior at dinner where they were – they being mostly prompted by Rollins, but Rollins and the other guys were involved in a discussion where they were kind of beating up on the Mexican controllers and Mexican staff.

(Trujillo Dep. 242:8-243:9) (emphasis added). If, in fact, Trujillo explicitly mentioned "race" to Gasperut, he certainly would not believe she misinterpreted his complaint. Trujillo's testimony, along with his admission that he did not mention any specific comments to Gasperut, lead to the conclusion that Gasperut had no basis to believe Trujillo was concerned with Rollins' racial comments.

9

In addition, it is clear from the record that Rollins' "brothers" comment and Rollins' "Fuck that cultural bullshit, Scott, and tell Juan to grow up" statement did not occur during the dinner at which Trujillo complained to Gasperut. (Trujillo Dep. 234:10-235:23; 237:8-19). Gasperut's mere presence at the dinner does not impute knowledge of Rollins' "brothers" or "Fuck that cultural bullshit" comments. Her presence only imputes knowledge of the "fucking worthless" comment. Thus, there is no basis to believe she knew the substance of Trujillo's complaint when he did not specify which comments bothered him and Gasperut knew only of the "fucking worthless" comment.

There is also no evidence that any other member of the executive management team had knowledge of Trujillo's protected activity. Likewise, he did not complain to DePierre or Williams. Nonetheless, Trujillo cites Gordon v. New York City Bd. of Educ., 232 F.3d 111 (2nd Cir. 2000) for the proposition that general corporate knowledge of protected activity is sufficient to satisfy the knowledge requirement. However, the defendant in Gordon admitted to knowledge of the protected activity throughout trial. Id. at 113. The court committed reversible error by agreeing that knowledge was not an issue during trial, only to later charge the jury that it was plaintiff's burden to prove defendant's knowledge of the protected activity. Thus, Gordon is inapposite. Here, each member of the executive management team denied knowledge of Trujillo's complaint to Gasperut, and Trujillo failed to rebut the denials with any evidence other than speculation. See Mulhall v. Ashcroft, 287 F.3d 543, 552 (6th Cir. 2002) ("[plaintiff] has failed to produce any evidence, direct or circumstantial, to rebut [the denials of supervisors that they did not know of plaintiff's protected activity]").

Although Trujillo did possess a good faith belief that he was engaging in protected activity in opposing Rollins' comments, a reasonable jury could not find Gasperut, nor any other member of the executive management team, shared the same belief. Consequently, Trujillo failed to establish an essential element of his claim.

### B. Causation

Regardless of whether Gasperut knew of Trujillo's protected activity, Trujillo also failed to establish a causal connection between the protected activity and his termination. Trujillo arrived home on September 8, only to be fired September 15. Thus, Trujillo asserts the temporal proximity between the two events is sufficient to establish this element. The Court disagrees.

Trujillo's only evidence of causation is the close proximity in time of the two events. However, without additional facts, this is insufficient. See Mulhall, 287 F.3d at 551 ("Temporal proximity, when coupled with other facts, may be sufficient in certain circumstances to establish [causation]"). Assuming Gasperut knew of the protected activity, there is insufficient evidence Gasperut communicated this to any other member of the executive management team. In addition, there is no evidence anyone involved in the decision to terminate Trujillo knew of his protected activity. Thus, Trujillo also failed to establish a causal connection between his protected activity and the adverse employment action.

### IV. CONCLUSION

Accordingly, Defendant's motion is **GRANTED**.

**IT IS SO ORDERED.**

                     s/Marianne O. Battani  
                     MARIANNE O. BATTANI  
                     UNITED STATES DISTRICT JUDGE

DATE: March 5, 2013

## CERTIFICATE OF SERVICE

       I hereby certify that on the above date a copy of this Opinion and Order was served upon all parties of record via the Court's ECF Filing System.

                     s/Bernadette M. Thebolt  
                     Case Manager